IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALICE WIDDOWS, as Administrator of
the Estate Of KEVIN F. WIDDOWS,

       Plaintiff,

v.

JACKSON COUNTY, SHERIFF
ROBERT BURNS, LEE KERSTEN,
BOBBY SMITH, WEYLIN WECE,
MICHAEL STRATTON, KAITLYN
STEARNS, FRANK CANO, KYLE
SPRADLING, NICHOLAS STEARNS,
SERGIO RAFAEL, GREG ROWALD,
GARRETT ETHERTON, CONNIE
FALKENBURY, and
BLAKE BACHMANN,

       Defendants.

Case No. 3:22-CV-00200-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are two motions for summary judgment: one filed by Defendant Nurse Connie Falkenbury ("Falkenbury") (Doc. 52), and one filed by Defendants Jackson County, Sheriff Robert Burns in his official capacity, Lee Kersten, Bobby Smith, Weylin Wece, Michael Stratton, Kaitlyn Stearns, Frank Cano, Kyle Spradling, Nicholas Stearns, Sergio Rafael, Greg Rowald, Garrett Etherton, and Blake Bachmann (collectively "County Defendants")[1] (Doc. 59). Both motions were filed several

---

[1] Jackson County and Sheriff Robert Burns in his official capacity are institutional defendants. *See Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013); *Franklin v. Zaruba*, 150 F.3d 682, 686 (7th Cir. 1998). Thus, where appropriate, the Court will refer to the remaining Defendants who are sued in their individual capacities, namely, Falkenbury, Kersten, Smith, Wece, Stratton, Kaitlyn Stearns, Cano, Spradling, Nicholas Stearns, Rafael, Rowald, Etherton and Bachmann as the "Individual Defendants."

months ago, in October 2023. Since then, Plaintiff and her attorney have gone radio silent. Plaintiff has neither filed responses to Defendants' pending motions, nor has she communicated with the Court in any way. The Court ordered Plaintiff to show cause as to her lack of engagement and even offered her an opportunity to submit responses to the pending motions for summary judgment several months after they were due. (Doc. 67). Now, based on the undisputed facts presented by Defendants, the Court grants both motions for summary judgment.

## BACKGROUND

This case arises out of the tragic death of Kevin Widdows ("Kevin"), who took his own life on February 2, 2021, while he was detained at the Jackson County Jail ("Jail"). (Doc. 15 at ¶ 6). On January 29, 2021, Kevin arrived at the Jail after being charged with Home Invasion, Aggravated Assault, and Criminal Damage to Property. (Falkenbury Statement of Facts ("SOF") at ¶ 1 (Doc. 52)). The arresting officer from the Carbondale Police Department gave the booking officer a "Prisoner Intake and Medical Report" form that included information about Kevin's medications, whether he is under the care of a physician for physical or psychological problems, and the arresting officer's observations, including whether he presented a suicide risk. (County Defendants SOF at ¶ 2 (Doc. 59)). Kevin's Prisoner Intake and Medical Report indicates that the Carbondale Police Department observed him to be "Alert and Cooperative" and did not deem him to be a suicide risk. *Id.* at ¶ 3. The arresting officer also completed a "Prisoner Acceptance Screening" questionnaire, which provided additional details about the Carbondale Police Department's observations of Kevin at the time of his arrest. *Id.* at ¶ 4. The Prisoner

Acceptance Screening questionnaire indicated "No" in response to the question, "Has the arrestee made any statements or actions that He/She may be suicidal or a danger to him/herself?" *Id.* at ¶ 5. It was the Jail's policy to place any detainee on suicide watch who, based on the booking officer's observations and the detainee's answers to the screening questionnaire, needed immediate mental health care or presented a suicide risk. *Id.* at ¶ 11. Kevin, however, denied any thoughts of self-harm when he spoke to the booking officer during intake. *Id.* at ¶ 10.

Also, per the Jail's policy, each detainee was assigned an appropriate housing and custody level based on the information gathered during booking. *Id.* at ¶ 12. Housing and custody levels include general population, protective custody, administrative segregation, medical observation, and suicide watch. *Id.* In Kevin's case, the booking officer found "no indication" to suggest that he was a suicide risk or "unsuitable for housing in general population and requiring suicide watch." *Id.* at ¶ 22.

The Jail also maintained a policy of providing "adequate mental health care" to its detainees. *Id.* at ¶ 13. In 2021, such non-emergency services were provided by an outside provider, Vadim Baram, Inc. *Id.* Crisis mental health services were provided by an entity called "Centerstone," which offered qualified mental health professionals "24 hours a day, 7 days a week, 365 days a year to respond and provide crisis mental health assessments and services" to detainees. *Id.* at ¶¶ 14, 17. Mental health professionals from Vadim Baram and Centerstone "assess[ed] whether an inmate with mental health issues is a suicide risk," and it was the Jail's policy to follow their recommendations. *Id.* at ¶ 18. Any detainee who made a statement indicating they might harm themselves or who

showed signs of self-harm or was even "believe[d]" to be a suicide risk, was placed on "suicide precautions" or "suicide watch." *Id.* at ¶ 19. A detainee under suicide precautions or on suicide watch received a "suicide prevention gown," a "suicide prevention blanket," and a tamper proof mattress. *Id.* at ¶ 20. Officers also checked on detainees who were on suicide watch every 15 minutes as opposed to every 30 minutes for detainees in the Jail's general population. *Id.*

None of the Individual Defendants had any information to suggest that Kevin had a history of suicidal behavior. *Id.* at ¶¶ 30, 33, 51; Falkenbury SOF at ¶¶ 16, 24. On February 1, 2021, at approximately 9:30 a.m., Elianna Lozoya, a Centerstone mental health crisis counselor, conducted a crisis evaluation of Kevin at the request of the State Attorney's Office. County Defendants SOF at ¶ 27. Ms. Lozoya indicated that although Kevin was "delusional, his judgment was impaired, and his mood was anxious," he was "not threatening, hallucinatory, homicidal, or suicidal." *Id.* Ms. Lozoya's report determined Kevin's risk of suicide or self-harm to be "zero." *Id.* After her crisis evaluation, Ms. Lozoya spoke with Sergeant Greg Rowald to ask why Kevin had been arrested. *Id.* at ¶ 29. Rowald told her that he was not familiar with the charges against Kevin and referred her to the Carbondale Police Department. *Id.* At that point, Ms. Lozoya told Rowald she had finished her call with Kevin and hung up. *Id.* Ms. Lozoya did not tell Rowald that Kevin was suicidal or that he should be placed on suicide watch. *Id.* After speaking with Ms. Lozoya, Rowald escorted Kevin back to his cell and observed Kevin to be "calm and cooperative," with no indication to suggest he was suicidal. *Id.* at ¶ 30.

Kevin also interacted with some of the other Individual Defendants on February 1, 2021. He asked Deputy Garrett Etherton for a phonebook, which Etherton provided to him. *Id.* at ¶ 24. Kevin showed no signs of distress, nor did he express any thoughts of self-harm to Etherton. *Id.* This was Etherton's only interaction with Kevin. *Id.* He also asked Deputy Nicholas Stearns if he could use the phone, but he did not exhibit any signs or behaviors suggesting he might harm himself. *Id.* at ¶ 25. At 1:15 p.m., Sergeant Rowald was with Kevin for his first court appearance from a Jail conference room, where Kevin was "cooperative" towards the judge, not upset, and did not offer any indication to suggest that he might harm himself. *Id.* at ¶ 31. Sergeant Rowald's only other contact with Kevin was during a cell check the following morning at 9:37 a.m., where Kevin was "awake and did not indicate any distress to Rowald." *Id.* at ¶ 32.

On the evening of February 1, 2021, Sergeant Kyle Spradling told Kevin that he was being moved from a cell in the booking area to a cell in N Block, and that Kevin would be single-celled as a precaution against the spread of COVID-19. *Id.* at ¶ 34. Kevin told Spradling that he understood and did not exhibit any signs of self-harm or express any intention of doing so. *Id.* Although Spradling was aware that Kevin had spoken to a Centerstone counselor, he received no information from Centerstone or otherwise about the nature of this call, nor did Spradling receive any information to suggest that Kevin was a suicide risk. *Id.* at ¶ 36.

At the time of Kevin's arrest and detention, Falkenbury worked as a nurse at the Jail Mondays through Fridays from 7 a.m. to 3 p.m. Falkenbury SOF at ¶ 8. Falkenbury's responsibilities included performing "History & Physical Exam[s]" on detainees within

two weeks of their arrival at the Jail. *Id.* at ¶ 9. If, based on this exam, Falkenbury believed a detainee was suicidal or homicidal, she put them in a green gown and referred them to Centerstone for mental health treatment. *Id.* at ¶ 13.

Falkenbury examined Kevin on February 1, 2021, and collected information from him about any psychiatric issues and history of suicide attempts and self-harm. *Id.* at ¶¶ 15, 16. Although Kevin reported having psychiatric issues, he denied a history of suicide attempts or self-harm and told Falkenbury that he was not suicidal. *Id.* at ¶¶ 16, 17. To Falkenbury, Kevin appeared alert and oriented to person, place, and time. *Id.* at ¶ 19. Thus, based on her exam, Falkenbury did not believe Kevin was at risk of committing suicide or harming himself.[2] *Id.* at ¶ 22. And this determination, according to Falkenbury's retained correctional healthcare expert, Karina Purcell, RN, was "reasonable and appropriate" and "met the standard of care." *Id.* at ¶¶ 37, 38.

On the morning of February 2, 2021, Deputy Jeremy Partridge received a call from a Mr. Michael Rich. County Defendants SOF at ¶ 37. Mr. Rich identified himself as a retired police officer and acquaintance of Kevin's family. *Id.* Although Mr. Rich told Partridge that Kevin had a "psychiatric disorder," he made no mention of Kevin being suicidal. *Id.* Partridge never told anyone about this call. *Id.*

On February 2, 2021, the officers on duty conducted regular checks of Kevin's cell at 30-minute intervals, and it is undisputed that they did so in a "timely manner." *Id.* at

---

[2] Falkenbury's only source of information concerning Kevin's medical history and condition was Kevin himself because she did not have access to his medical records. Falkenbury SOF at ¶ 24. Falkenbury's routine History & Physical Exam was her only interaction with Kevin until she was called to his cell after he was found unresponsive on February 2, 2021. *Id.* at ¶ 27.

¶ 53. As noted, Sergeant Rowald completed a check of Kevin's cell at 9:37 a.m., where Kevin was "awake and did not indicate any distress." *Id.* at ¶ 32. At approximately 11:27 a.m., Deputy Nicholas Stearns checked on Kevin and did not observe any signs of distress or hear Kevin express thoughts of suicide or self-harm. *Id.* at ¶ 39. At 11:57 a.m., Corporal Michael Stratton conducted another check of Kevin's cell. *Id.* at ¶ 40. Stratton also observed Kevin to be alive and not in distress. *Id.* This was Stratton's only interaction with Kevin while Kevin was detained at the Jail. *Id.* at ¶ 46. Deputy Blake Bachman conducted another cell check at 12:46 p.m., where he observed Kevin to be alive. *Id.* at ¶ 41. This was Bachman's only contact with Kevin while he was detained at the Jail. *Id.* Deputy Sergio Rafael conducted another cell check at 1:11 p.m., where Kevin was awake, sitting on the bottom bunk of the bed, and not exhibiting any signs of self-harm. *Id.* at ¶ 42. At approximately 1:36 p.m., Deputy Francis "Frank" Cano was conducting a security check of N Block, when he saw Kevin through the window of his cell, sitting next to his bed, slouched forward, with a sheet around his neck and blood on his face. *Id.* at ¶ 43.

Cano issued an emergency call, prompting Deputies Kaitlyn and Nicholas Stearns,[3] Sergeant Spradling, and Corporal Stratton to respond. *Id.* at ¶¶ 43-46. Deputy Nicholas Stearns was the first to arrive; he removed the sheet from around Kevin's neck, lowered him to the floor and began CPR. *Id.* at ¶ 44. Sergeant Spradling assisted a nurse with an Automated External Defibrillator. *Id.* Deputy Kaitlyn Stearns also assisted with

---

[3] Although Deputies Kaitlyn and Nicholas Stearns share the same last name, there is no indication to suggest a familial relationship.

CPR, although that was her only contact with Kevin during his time at the Jail. *Id.* at ¶ 45. Similarly, Sergeants Bobby Smith and Weylin Wece responded to Cano's emergency call, but neither had any other contact with Kevin while he was detained. *Id.* at ¶¶ 47, 48. The officers and Falkenbury performed CPR on Kevin until paramedics arrived seven minutes after Cano discovered him. *Id.* at ¶ 50. Efforts to save Kevin's life were unsuccessful.

At no point during Kevin's detainment were Bachmann, Cano, Etherton, Kaitlyn Stearns, Nicholas Stearns, Rafael, Smith, Spradling, Stratton, Wece, Rowald, or Kersten ever informed that Kevin had a history of psychiatric disorders or had been suicidal. *Id.* at ¶¶ 29-32, 51. Moreover, neither Bachmann, Cano, Etherton, Kaitlyn Stearns, Nicholas Stearns, Rafael, Smith, Spradling, Stratton, Wece, Kersten, nor Rowald were involved in Kevin's booking and intake on January 29, 2021. *Id.* at ¶ 52.

As part of their training, the Jail's officers were required to complete the "Illinois Corrections Officer 200 Hour Basic Training" program. *Id.* at ¶ 56. This training covered numerous topics, including detainee rights and privileges, processing and documentation of arrestees, classification and assignment of detainees, medical services, and mental health and suicide prevention. *Id.* In addition, all corrections officers underwent a 240-hour field training program that instructed them on booking procedures, inmate classification, inmate supervision, medical services, mental health and suicide prevention procedures, emergency procedures, cell checks, memo writing, and record keeping. *Id.* at ¶ 58. Finally, the Jail required its officers to take annual "in-service training[s]" on mental health and suicide prevention. *Id.* at ¶ 59.

Alice Widdows ("Alice" or "Plaintiff"), Kevin's mother and Administrator of his Estate, filed this lawsuit against Falkenbury and the County Defendants on February 1, 2022. (Doc. 1). She filed an amended complaint on April 28, 2022, asserting the following claims: (1) Failure to Protect under the Fourteenth Amendment of the United States Constitution against the Individual Defendants (Count I); (2) a *Monell* Claim against Sheriff Robert Burns in his official capacity and Jackson County (Count II); (3) Wrongful Death under Illinois law against the Individual Defendants and Sheriff Burns (Count III); (4) *Respondeat Superior* under Illinois law against Sheriff Burns (Count IV); and (5) Indemnification under Illinois law against Jackson County (Count V).[4] (Doc. 15 at ¶¶ 31-60).

After addressing the applicable legal standard, the Court will begin its analysis of Alice's claims with Counts I and III, as they are asserted against the Individual Defendants. The Court will then turn to Counts II, IV, and V, which are asserted against Sheriff Burns and Jackson County.

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions,

---

[4] This Court has subject matter jurisdiction over Alice's claims pursuant to 28 U.S.C. §§ 1331 & 1367.

interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In addition to these well-known principles, "[l]ocal rules . . . provide . . . further direction and have the force of law" at summary judgment. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020). This Court's local rules require the moving party to submit a Statement of Material Facts, listing in separately numbered paragraphs with supporting record citations, each fact that "bears directly on a legal issue raised in the motion" for summary judgment. S.D. Ill. R. 56.1(a). The responding party must respond to each fact raised in the moving party's Statement of Material Facts, with specific record citations of its own in support of any disputed facts. *Id.* at § (b). The responding party may also submit their own Statement of Additional Material Facts if necessary to inform the disputed issues in the motion for summary judgment. *Id.* at § (c). Importantly for present purposes, "[a]ll material facts set forth in a Statement of Material Facts . . . shall be deemed admitted for purposes of summary judgment unless specifically disputed." *Id.* at § (g). This process is critical to the efficient and economical resolution of summary judgment motions because it "help[s] the court assess whether a particular

claim should proceed to trial or instead can be resolved on the existing record."[5]

*Hinterberger*, 966 F.3d at 577.

DISCUSSION

### A. Count I: Fourteenth Amendment Failure to Protect Claim against the Individual Defendants

Because Kevin was a pretrial detainee at the time of his suicide, Alice's failure to protect claim against the Individual Defendants arises under the Due Process Clause of the Fourteenth Amendment. *Kemp v. Fulton Cnty.*, 27 F.4th 491, 495-97 (7th Cir. 2022). This standard demands evidence showing that "(1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries." *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022). The Court will focus its analysis on the third element—whether the Individual Defendants acted reasonably under the circumstances. The critical question is whether "a specific defendant was on notice of a serious risk of harm to the detainee." *Id.* (internal

---

[5] Although Plaintiff did not respond to Defendants' motions for summary judgment or the Court's show cause order dated April 4, 2024, her apparent disengagement from the case is not alone dispositive of Defendants' motions. Even though the Local Rules deem undisputed material facts admitted for purposes of a summary judgment motion "a failure to file a timely response to such a motion [for summary judgment] is not a basis for automatically granting summary judgment as some kind of sanction." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Thus, "where a nonmovant fails to respond to a motion for summary judgment, the movant still ha[s] to show that summary judgment was proper given the undisputed facts." *Id.* (internal quotation marks omitted).

quotation marks omitted).

The Seventh Circuit has made it clear that a failure to protect claim based on a detainee's suicide or attempted suicide requires more than a speculative possibility that the detainee may harm himself. *Jump v. Village of Shorewood*, 42 F.4th 782, 793-94 (7th Cir. 2022); *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). Here, several of the Individual Defendants had such infrequent or fleeting contact with Kevin that they could not have reasonably anticipated Kevin's intention to commit suicide. Others may have known that Kevin had psychiatric problems, or that he was "delusional" and "anxious," but there is no indication to suggest that they reasonably should have known that Kevin was at risk of committing suicide. Because Alice has not responded to the pending motions for summary judgment, the facts alleged in Falkenbury's and the County Defendants' motions are deemed admitted under this Court's Local Rules. This factual record as presented, even when viewed in the light most favorable to Alice, does not preclude summary judgment on her failure to protect claim under the Fourteenth Amendment. *See id.* at 550-51 ("invitation to speculate" about plaintiff's suicide risk in jail not enough to escape summary judgment).

Beginning with Falkenbury, she examined Kevin on February 1, 2021, and collected information about his mental health. During this exam, Kevin denied being suicidal and denied any history of suicide attempts. Falkenbury noted that Kevin was alert and oriented to person, place, and time, leading her to believe that he was not at risk of committing suicide. Considering Falkenbury's observations and the fact that Kevin himself was her only source of information regarding his mental health and potential

suicide risk, Falkenbury is entitled to summary judgment on Alice's failure to protect claim. *See id.* at 553 (plaintiff's concern about dying and possible "anxiety attack" "did not put [nurse] on notice that he might be contemplating suicide.").

The remaining Individual Defendants had even less information available to them from which to conclude that Kevin may have been at risk of committing suicide. Sergeant Rowald spoke with Elianna Lozoya shortly after she conducted a crisis evaluation of Kevin on February 1, 2021. Ms. Lozoya's notes from her evaluation indicated that Kevin was "delusional," "his judgment was impaired," and he was "anxious." But even so, Ms. Lozoya found Kevin to be "not threatening, hallucinatory, homicidal, or suicidal." Although it is unclear whether she even told Sergeant Rowald about these observations, assuming that she did, such information is insufficient to put Rowald on notice that Kevin might be suicidal. *See Jump*, 42 F.4th at 794 ("general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide.").

Sergeant Spradling spoke with Kevin on the evening of February 1, 2021, to inform him that he was being moved to a single cell in the Jail's general population as a precaution against the spread of COVID-19. Kevin told Spradling that he understood and did not show any signs of distress or intention to self-harm. Spradling was aware that Kevin had spoken to a Centerstone counselor, but he received no information about the nature of this call, nor did Spradling receive any other information to suggest that Kevin was a suicide risk. *See Thomas*, 39 F.4th at 842 ("Without more, . . . simply being housed in the Jail's general population, even while suffering from PTSD, is not a particular

enough risk in the failure-to-protect context."). Spradling's next interaction with Kevin was after he committed suicide, when he arrived at Kevin's cell to assist in providing life-saving measures. This is not enough to survive summary judgment, as "each of these facts would not have made a reasonable officer in Sgt. [Spradling's] position think [Kevin] was a suicide risk." *Jump*, 42 F.4th at 793; *see also Pulera*, 966 F.3d at 554 (knowledge of detainee's "acute anxiety" not enough to put jail personnel on notice of suicide risk); *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (similar).

Deputy Etherton only interacted with Kevin once, when Kevin asked him for a phone book. Kevin showed no signs of distress, nor did he express any thoughts of self-harm during this interaction. Similarly, Deputies Bachman and Rafael, and Corporal Stratton each only interacted with Kevin once as they conducted a check of Kevin's cell. Deputy Nicholas Stearns interacted with Kevin when he asked him if he could use the phone and during a cell check at 11:27 a.m. on February 2, 2021. All five of these Individual Defendants observed Kevin to be alive, and none of them gathered any information during these brief encounters that would have suggested that Kevin was a suicide risk. Deputies Etherton, Rafael, Bachman, and Nicholas Stearns, as well as Corporal Stratton, are thus entitled to summary judgment on Alice's failure to protect claim. *See Jump*, 42 F.4th at 793 ("[W]hen an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions"). The same is true of Deputy Cano. His only interaction with Kevin involved the cell check at 1:36 p.m. on February 2, 2021, when he found Kevin next to his bed, slouched forward, with a sheet around his neck and blood on his face. As tragic as that scene must have appeared, there

is no indication in the record to suggest that Deputy Cano should have been aware of Kevin's suicide risk *before* he found him unresponsive in his cell.

Several of the other Individual Defendants had no interaction with Kevin at all before he took his own life. Deputy Kaitlyn Stearns arrived at Kevin's cell to assist in providing CPR, but there is no evidence to suggest that she interacted with Kevin or received any information before his death that would have put her on notice of a risk of self-harm. Similarly, Sergeants Smith and Wece arrived at Kevin's cell after Deputy Cano issued the emergency call, but neither had any other contact with Kevin during his time at the Jail. Finally, Lieutenant Kersten never had any direct interaction with Kevin prior to his suicide, nor did he receive any information to suggest Kevin's risk of self-harm before the fact. *See Buford v. City of Chicago, Ill.*, No. 08 C 214, 2009 WL 4639747, at *3 (N.D. Ill. Dec. 3, 2009) ("[O]fficers must receive some form of notice of suicide risk before their failure to prevent an arrestee's suicide can be considered objectively unreasonable.").

*Jump* and *Pulera* are almost indistinguishable from this case. In both cases, the detainee denied being suicidal and showed the defendants no obvious signs of distress that would have put them on notice of a suicide risk. *Jump*, 42 F.4th at 794; *Pulera*, 966 F.3d at 551. If anything, these cases dealt with more evidence of a risk of self-harm than this record reveals. In *Jump*, the decedent informed booking officers of his history of psychiatric treatment and officers noticed him being agitated and making loud noises in the early morning hours after his arrest. *Jump*, 42 F.4th at 787. In *Pulera*, the plaintiff's brother told officers that he might hurt or kill himself and officers witnessed him being combative and drunk. *Pulera*, 966 F.3d at 545, 548. Alice, on the other hand, has offered

no such evidence to suggest Kevin's suicide risk. It is undisputed that Kevin underwent a crisis evaluation with Ms. Lozoya and was examined by Falkenbury. But neither of these interactions resulted in any evidence that would have reasonably suggested that Kevin was a suicide risk. Indeed, Kevin *denied* being suicidal in his conversations with them, and Ms. Lozoya and Falkenbury thus concluded that he was not suicidal. *See id.* at 551 ("Given Pulera's express statement that he was not considering suicide and the absence of more or more significant indirect signs, no rational jury could find that [the officer] unreasonably placed Pulera in general population."). And in any event, the information that Ms. Lozoya and Falkenbury gathered during their meetings with Kevin was never distributed to the remaining Individual Defendants. The same is true of Deputy Partridge's call with Mr. Rich. Although Mr. Rich told Partridge that Kevin had a "psychiatric disorder," he made no mention of Kevin being suicidal. Deputy Partridge also did not share this information with the Individual Defendants or anyone else for that matter. *See Estate of Novack*, 226 F.3d at 529-30; *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1042 (7th Cir. 1998).

"The constitutional expectation is that guards act responsibly under the circumstances that confront them, not that they anticipate every potential danger facing a detainee." *Thomas*, 39 F.4th at 842 (internal quotation marks omitted). Here, the record reveals no evidence that Kevin made any statement or gave any indication to suggest he might take his own life. While Ms. Lozoya may have deemed Kevin to be "delusional" and "anxious," none of the Individual Defendants could have reasonably detected a suicide risk based on their interactions with him. At best, the evidence aligns with the

principle that "[n]ot every prisoner who shows signs of depression can or should be put on suicide watch." *Pulera*, 966 F.3d at 551 (quoting *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) (alterations omitted)). And under *Jump* and *Pulera*, the evidence is simply insufficient to survive summary judgment. The Court thus grants Defendants' motions for summary judgment as to Count I of Alice's amended complaint.

## B. Count III: Wrongful Death Claim against the Individual Defendants and Sheriff Burns

In Count III, Plaintiff asserts a wrongful death claim under Illinois law against the Individual Defendants and Sheriff Burns in his official capacity. Falkenbury argues that she is entitled to summary judgment due to Alice's failure to submit an affidavit of merit and a health professional's report as required by the Illinois Healing Arts Malpractice Act. *See* 735 ILCS 5/2-622. The County Defendants argue that they are entitled to summary judgment because they are immune from liability under the Illinois Governmental Employees Tort Immunity Act ("Tort Immunity Act"). *See* 745 ILCS 10/4-103 & 4-105.

### i.  *Wrongful Death Claim against Falkenbury*

Because Alice has not proffered any evidence in support of her wrongful death claim, the Court is unable to identify a coherent theory of liability against Falkenbury. Nevertheless, her amended complaint faults Falkenbury and other Defendants for their failure to identify Kevin's suicide risk and to respond accordingly. Falkenbury argues that this claim is subject to section 2-622 of the Healing Arts Malpractice Act, which requires a plaintiff in a medical malpractice case to submit (1) an affidavit stating that

"there is a reasonable and meritorious cause" for litigation, and (2) a health professional's report supporting the same. 735 ILCS 5/2-622. It is undisputed that Alice did not submit these documents in support of her wrongful death claim. Falkenbury SOF at ¶ 33. Thus, if Alice's wrongful death claim against Falkenbury is subject to the requirements of section 2-622, then summary judgment is appropriate at this stage of the case. *Young v. United States*, 942 F.3d 349, 352 (7th Cir. 2019).

"It is the nature of plaintiff's claim . . . that determines whether the provisions of section 2-622 are implicated." *Cohen v. Smith*, 648 N.E.2d 329, 334 (Ill. App. Ct. 1995). In *Cohen*, the plaintiff was treated at a hospital in connection with the birth of her child. *Id.* at 331. The plaintiff (Mrs. Cohen) and her husband (also a plaintiff in the case) had informed the treating physician that their religious beliefs prohibited Mrs. Cohen from being seen unclothed by another man. *Id.* During Mrs. Cohen's cesarian section, a male nurse allegedly observed and touched her while she was in a state of undress. *Id.* The plaintiffs advanced claims for battery, intentional infliction of emotional distress, and violation of the Illinois Right of Conscience Act against the nurse and the hospital. *Id.* The court found that the nature of these claims did not implicate section 2-622 because the plaintiffs did not allege that the defendants "violated any medical standard." *Id.* at 333. Rather, the defendants allegedly violated the plaintiffs' privacy interests by touching Mrs. Cohen without her consent. *Id.* The court explained that the nature of this claim sounded in simple battery, not medical malpractice, because it did not arise "by reason of medical, hospital, or other healing art malpractice." *Id.* at 333-34 (emphases omitted). As a result, the requirements of section 2-622 did not apply to the plaintiffs' claims. *Id.* at

334.

Here, Alice's disengagement from the case and concomitant lack of evidence to support a theory of liability makes it hard to identify the "nature" of her claim. Alice ostensibly faults Falkenbury for her performance as a Registered Nurse charged with caring for Kevin while he was detained at the Jail. Falkenbury's job responsibilities included conducting History & Physical Exams of detainees within two weeks of their arrival at the Jail. During this exam, it was Falkenbury's job to spot suicidal or homicidal tendencies in inmates and, if necessary, refer them to Centerstone for mental health treatment and identify them by giving them a green gown. She did so with Kevin and deemed him not to be a suicide risk.

Alice claims that Falkenbury "knew [Kevin] had mental health problems and should be monitored as a suicide risk but failed to have him under such watch." Falkenbury SOF ¶ 5. This purported knowledge of Kevin's metal state and suicide risk would have been based on Falkenbury's examination of him on February 1, 2021, as that was Falkenbury's only interaction with him while he was detained at the Jail. During this exam, Falkenbury relied on her skill and medical judgment to determine whether Kevin needed any special medical or mental health treatment. Alice's claim thus appears to be based the theory that Falkenbury made an error in professional judgment not to place Kevin on suicide watch. The nature of Alice's claim thus appears to fit comfortably within the scope of section 2-622, regardless of whether Falkenbury was a mental health professional or not. "A plaintiff challenging an implicit part of the medical treatment should not be able to avoid the requirement of an expert medical opinion simply by

claiming medical battery or something other than medical malpractice." *Holzrichter v. Yorath*, 987 N.E.2d 1, 19 (Ill. App. Ct. 2013). This conclusion is supported by the undisputed record evidence showing that Falkenbury "appropriately determined that [Kevin] was not a suicide risk" and "met the standard of care in her care and treatment of [Kevin]."

Based on these facts, the Court is persuaded that the nature of Alice's claim sounds in medical malpractice based on Falkenbury's failure to spot Kevin's suicide risk during her exam. *See Young*, 942 F.3d at 350 (medical malpractice claim against jail doctors based on refusal to offer cataract surgery subject to section 2-622); *Hahn v. Walsh*, 762 F.3d 617, 625, 633 (7th Cir. 2014) (same for wrongful death claim against jail nurses based on inadequate treatment of detainee who died of diabetic ketoacidosis). Thus, Alice's wrongful death claim against Falkenbury is subject to section 2-622, and it was incumbent upon her to submit an affidavit of merit and a physician's report in support.

A plaintiff's failure to provide an affidavit of merit and a health professional's report after discovery closes warrants summary judgment on claims subject to section 2-622. *Young*, 942 F.3d at 352. This Court previously denied Falkenbury's motion to dismiss Alice's wrongful death claim against her because, under *Young*, dismissal would have been premature at the pleading stage. (Doc. 36). Now that this case has reached summary judgment, the issue is ripe for resolution. Alice's admitted failure to provide an affidavit of merit and a healthcare professional's report supporting her wrongful death claim against Falkenbury renders it fatally defective. *See Ruffin v. Basnett*, No. 3:19-cv-00896-SMY, 2022 WL 11326422, a *5 (S.D. Ill. Oct. 19, 2022). As a result,

Falkenbury is entitled to summary judgment on Alice's wrongful death claim against her.

      ii.    *Wrongful Death as to the County Defendants*

Alice also asserts a wrongful death claim against the individual County Defendants and Sheriff Burns. The County Defendants rely on sections 4-103 and 4-105 of the Tort Immunity Act to argue that they are immune from liability. Section 4-103 states:

> Neither a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners.

745 ILCS 10/4-103. The Illinois Appellate Court has interpreted this section to "bar claims grounded upon allegations of failing to safeguard [persons] while detained in jail." *Fraley v. City of Elgin*, 621 N.E.2d 276, 281 (Ill. App. Ct. 1993). Section 4-105, for its part, provides:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

740 ILCS 10/4-105. This section immunizes public officials from liability based on the failure to provide medical care to detainees unless the failure was willful and wanton. *Jones v. Matthews*, 2 F.4th 607, 615 (7th Cir. 2021). Thus, sections 4-103 and 4-105 are thematically distinct and their applicability depends on the nature of the asserted claim. *See White v. Watson*, No. 16-cv-560-JPG-DGW, 2018 WL 047934, at *15 n.7 (S.D. Ill. May 2,

2018) (applicability of immunity provision depends on plaintiff's theory of liability).

Alice's failure to present a coherent theory of liability supported by record evidence makes it difficult to evaluate the nature of her claim and the applicability of the asserted immunity defenses. But this evidentiary gap does not prevent the resolution of the County Defendants' motion for summary judgment. The Court agrees with the County Defendants that Alice's wrongful death claim against them is barred by the Tort Immunity Act, whether it is based on their failure to protect Kevin from taking his own life or their failure to provide adequate medical and mental health care.

Section 4-103 broadly provides immunity from claims based on the operation and supervision of a jail. The Illinois Appellate Court's decision in *Fraley v. City of Elgin* shares many factual similarities with this case and is thus instructive as to the scope of section 4-103. 621 N.E.2d at 280. There, an arrestee exhibited "unusual behavior" as he was being transported to a local jail. *Id.* at 278. After he arrived at the jail, he was "not checked on a regular basis nor were any special precautions taken." *Id.* Later that day, he was found dead in his cell after hanging himself. *Id.* The arrestee's estate filed suit alleging that:

> [D]efendants were guilty of carelessly, negligently, and wilfully [sic] failing to check decedent on a regular basis, remove his personal effects at the time of detention, supervise the cell blocks, seek a treatment alternative to detention, exercise practices and customs relative to intoxicated or self-destructive persons, maintain a camera surveillance system, and inspect the jail facility for health and safety hazards.

*Id.* Notwithstanding these general allegations, the court noted the lack of evidence showing that the defendants "were on notice of circumstances indicating that the suicide was immediately imminent." *Id.* at 280. And with this lack of notice, the court found that

the section 4-103's reference to "jail[s]" and its specific liability exemption for claims based on the failure to provide "periodic inspections of prisoners" covered the nature of the plaintiff's claim. *Id. Fraley* thus concluded that section 4-103 "expressly immunizes local public entities and public employees from claims arising out of the failure to provide sufficient equipment, personnel, supervision or facilities therein." *Id.* And for that reason, the plaintiff's claim that the defendants were liable for the detainee's suicide based on their failure to safeguard the jail from such events fit squarely within the scope of section 4-103. *Id.*

*Fraley* is on all fours with this case. Alice's wrongful death claim against the individual County Defendants and Sheriff Burns cannot survive a properly invoked immunity defense under section 4-103. To the extent she claims that the individual County Defendants and Sheriff Burns are liable based on their failure to place Kevin on suicide watch, such a claim fails because, as previously discussed, they had no notice of Kevin's suicide risk and section 4-103 grants them immunity for their alleged failure to "monitor, supervise, or otherwise maintain the jail facility in a manner so as to safeguard [him] from the consequences of his own actions in taking his life." *Id.; see also Payne for Hicks*, 161 F.3d at 1045-46 (finding municipality immune from liability for detainee's suicide under section 4-103); *but see Williams v. City of Chicago*, No. 94 C 3350, 1995 WL 88926, at *5 (N.D. Ill. Mar. 2, 1995) (holding section 4-103 does not immunize public officials from liability when they were on notice of detainee's "suicidal condition"). For that reason, the individual County Defendants and Sheriff Burns are entitled to summary judgment on Alice's wrongful death claim to the extent that it is based on their

failure to safeguard the Jail and place him on suicide watch.

To the extent that Alice's wrongful death claim against the individual County Defendants and Sherriff Burns is based on their failure to provide proper medical care to Kevin, her inability to establish a Fourteenth Amendment violation is dispositive. *Cf. Jones*, 2 F.4th at 615. Section 4-105 immunizes public employees from liability for their failure to provide proper medical care to prisoners unless the failure was "willful and wanton." And with this immunity grant, a plaintiff's failure to establish a deliberate indifference claim under the Eighth Amendment is dispositive of a corresponding wrongful death claim under Illinois law because "the standard for assessing whether conduct is willful and wanton is remarkably similar to the deliberate indifference standard." *Id.* at 615 (citation and quotation marks omitted); *see also Williams v. Rodriguez*, 509 F.3d 392, 405 (7th Cir. 2007) (summary judgment on deliberate indifference claim is "dispositive" of state law claim subject to section 4-105's "willful and wanton" standard). It is further settled that federal claims arising under a Fourteenth Amendment's objective reasonableness standard, as Alice's constitutional claim does, are subject to a less demanding standard than claims arising under the Eighth Amendment. *See Pulera*, 966 F.3d at 550 ("This objective rule is easier for a plaintiff to meet than the subjective deliberate-indifference standard used under the Eighth Amendment."). Logically then, Alice's failure to survive summary judgment on her Fourteenth Amendment claim is dispositive of her wrongful death claim based on inadequate medical and mental health care at the Jail. If she is unable to meet the more plaintiff-friendly objective standard under the Fourteenth Amendment, she is necessarily unable to prove that the individual

County Defendants and Sherriff Burns acted willfully and wantonly under section 4-105. *See Jones*, 2 F.4th at 615 ("Because summary judgment was proper on Jones's deliberate indifference claim, it was also proper on her wrongful death claim."). Thus, the individual County Defendants and Sherriff Burns are entitled to summary judgment on Alice's wrongful death claim based on inadequate medical care.

### C. Count II: *Monell* Claim against Jackson County and Sheriff Robert Burns

In Count II of her amended complaint, Alice asserts a *Monell* claim against Sheriff Burns in his official capacity and Jackson County. *See Monell v. Dep't. of Soc. Srvs. of City of New York*, 436 U.S. 658 (1978). At its core, a *Monell* claim requires evidence of a municipal policy, custom, or practice that violates a plaintiff's constitutional rights. *Hahn*, 762 F.3d at 638. It was thus incumbent upon Alice, at this stage of the litigation, to offer evidence showing "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Pulera*, 966 F.3d at 550 (quoting *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020)). A qualifying municipal policy can be established in one of three ways: "[1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Hahn*, 762 F.3d at 640 (quoting *Rice ex rel. Rice v. Corr. Med. Srvs.*, 675 F.3d 650, 675 (7th Cir. 2012)).

Alice appears to rely on the second type of policy to advance her *Monell* claim,

unwritten but "widespread practice[s]." This is not an easy standard to meet because she must "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (quoting *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). Alice cites three alleged widespread practices that she claims show an inadequate suicide prevention policy at the Jail: (1) denial of mental health treatment; (2) denial of access to safe and secure suicide prevention cells; and (3) inadequate training and supervision of officers.

As to the first two of these practices, Alice cites a merit review order from District Judge J. Phil Gilbert of this Court, which summarizes *allegations* in another plaintiff's complaint about the Jail's inadequate provision of mental health care services and suicide prevention precautions. While these allegations may have been enough at the pleading stage, Alice must offer admissible evidence of the Jail's practices and/or failures to defeat a motion for summary judgment. And to that end, she would have to show, among other things, that "but for" these deficiencies, the Jail's officers, nurses, and other personnel would have been aware of Kevin's suicide risk. *Estate of Novack*, 226 F.3d at 532. The record reveals no such evidence. To the contrary, it is undisputed that the Jail had several policies and procedures in place to identify and protect detainees who may have presented a suicide risk. The arresting officers shared their observations of an arrestee with the Jail by completing a "Prisoner Intake and Medical Report" form and a "Prisoner Acceptance Screening" questionnaire. Both of these documents provided information

about the arrestee's suicide risk and the questionnaire even asked the arresting officer whether "the arrestee made any statements or actions that He/She may be suicidal or a danger to him/herself?" Separately, any detainee who exhibited suicidal behavior during the booking process was to be placed on suicide watch and the Jail maintained a policy of providing "adequate mental health care" to all detainees through Vadim Baram, Inc., a third-party provider. Finally, crisis mental health services were provided by Centerstone "24 hours a day, 7 days a week, 365 days a year to respond and provide crisis mental health assessments and services" to detainees. The critical question here is not whether these policies and procedures were unimpeachable, but rather (i) whether they suffered from deficiencies that increased the risk of detainee suicides, and (ii) whether the municipality was aware of these deficiencies and chose not to act, thus permitting an inference of deliberate indifference. *Pulera*, 966 F.3d at 551; *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *see also Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."). The record reveals neither evidence of an inadequate policy or practice, nor municipal notice.

Alice also cites another detainee's suicide seven months before Kevin's as evidence of an inadequate suicide prevention policy.[6] But here too, she has developed no evidence

---

[6] Alice also cites another suicide at the Jail that occurred *after* Kevin's to show an unconstitutional custom or policy. This event has no bearing on Alice's *Monell* claim because "subsequent conduct usually cannot be used to establish municipal liability." *Hurt v. Vantlin*, No. 3:14-cv-00092-JMS-MPB, 2016 WL 3144992, at *1 (S.D. Ind. June 6, 2016). And even if this subsequent event were considered, it would be insufficient to establish the type of "systemic and gross deficiencies" that Alice needs to show to survive a summary judgment motion. *Hildreth*, 960 F.3d at 426 (quotation marks and citation omitted).

about this event to support its evidentiary value as an indication of a widespread custom or practice that failed to prevent Kevin's suicide. And even if she had, it would be a tough row to hoe for Alice because her theory of liability "requires more than a showing of one or two missteps." *Hildreth*, 960 F.3d at 426 (internal quotation marks omitted). It is true that the Seventh Circuit "has not adopted any "bright-line rules" defining a widespread practice or custom, [but it has] acknowledged that the frequency of conduct necessary to impose *Monell* liability must be more than three." *Id.* at 427. Thus, even if Alice could point to evidence of analogous misconduct or omissions that led to the suicide that preceded Kevin's, the number of relevant events is too small to suggest a widespread practice. Simply put, without record evidence to support her claims of widespread denials of mental health treatment and suicide prevention cells, she is unable to rely on these alleged practices to support *Monell* liability against Jackson County and Sheriff Burns.

Alice also contends that Kevin's suicide was the result of Sheriff Burns's and Jackson County's inadequate training and supervision of its officers at the Jail. Here again, Alice offers no evidence to support this claim. Rather, the evidence shows that the officers underwent a 200-hour basic training program, a field-training program, and annual specialized training on suicide prevention and mental health. Alice fails to point to evidence of specific gaps in training that would have helped the Individual Defendants recognize Kevin's suicide risk or to identify any means of supervision that were lacking and could have prevented Kevin's death. This evidentiary hole is fatal to her *Monell* claim based on inadequate training and supervision. *See Lapre v. City of Chicago*, 911 F.3d 424,

437 (7th Cir. 2018) (lack of evidence supporting municipal culpability and causation fatal to *Monell* claim based on inadequate training and supervision of corrections officers); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005).

Viewing the evidence in the light most favorable to Alice, the record reveals no evidence of inadequate suicide prevention policies. And without such evidence, there can be no *Monell* liability here. *Lapre*, 911 F.3d at 434; *see also Hudson v. Zettergren*, No. 17 C 7493, 2020 WL 1698886, at *4 & n.1 (N.D. Ill. Apr. 8, 2020) (lack of record support for *Monell* claim after plaintiff failed to respond to motion for summary judgment warranted judgment in favor of municipal defendants). Accordingly, Alice's *Monell* claim against Jackson County and Sheriff Burns based on inadequate suicide prevention policies cannot survive summary judgment.

### D.  Count IV: *Respondeat Superior* against Sheriff Burns

In Count IV of her amended complaint, Alice asserts a claim of *respondeat superior* against Sheriff Burns in his official capacity. This claim can be disposed of more simply than the previous ones because Sheriff Burns's liability under a *respondeat superior* theory is, by definition, derivative of the liability of at least one of his employees. *Gaston v. Ghosh*, 920 F.3d 493, 497 (7th Cir. 2019). The vicarious nature of this claim requires "an actionable wrong, by a person whose conduct is imputed to the employer." *Id*. Here, there is no "actionable wrong," as all of Alice's claims against the Individual Defendants are fatally defective under Rule 56 of the Federal Rules of Civil Procedure. *See Slabon v. Sanchez*, No. 15-cv-08965, 2020 WL 5763760, at *28 (N.D. Ill. Sept. 28, 2020) ("*Respondeat superior* is derivative liability, meaning that it requires wrongdoing by an employee. The Hospital

can't be liable under *respondeat superior* if no employee engaged in wrongdoing.") (italics

added). For that reason, Sheriff Burns is entitled to summary judgment on Alice's claim

of *respondeat superior* liability.

### E. Count V: Indemnification against Jackson County

Finally, Count V of Alice's amended complaint asserts a claim for indemnification

under Illinois law against Jackson County. This claim fails for the same reason as her

*respondeat superior* claim. Without a viable claim against either Falkenbury or the County

Defendants, there is no basis for indemnification under Illinois law. *Patrick v. City of*

*Chicago*, 81 F.4th 730, 737 (7th Cir. 2023); *Webb v. City of Batavia*, No. 22 CV 228, 2023 WL

6795590, at *6 (N.D. Ill. Oct. 13, 2023).

## CONCLUSION

For the reasons set forth above, the motions for summary judgment filed by

Falkenbury (Doc. 52) and the County Defendants (Doc. 59) are **GRANTED**. This entire

action is **DISMISSED with prejudice**. The Clerk's Office is **DIRECTED** to close this case

and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  August 2, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**